ROUCH v ENQUIRER & NEWS OF BATTLE CREEK

Docket No. 75044. Argued January 15, 1986 (Calendar No. 14).
Decided December 26, 1986. Rehearing denied 428 Mich 1207.

David J. Rouch brought an action in the Calhoun Circuit Court
against the Enquirer & News of Battle Creek, alleging that a
report in the defendant's newspaper concerning his arrest in
connection with a rape for which he was not charged and was
later released, was false and defamatory. The court, Stanley
Everett, J., granted summary judgment for the defendant,
finding that the article was entitled to a qualified privilege
under Michigan law and that in the absence of malice it was
not a basis for an action. The Court of Appeals, R. M. MAHER,
P.J., and GRIBBS and SANBORN, JJ., reversed, holding that the
general privilege to report judicial proceedings is limited to the
fact of an arrest only and not particular details of the alleged
crime, that the trial court erred by ruling that plaintiff must
show that defendant possessed malice when it printed its
article, and that, instead, a private-figure plaintiff need only
show that the defendant was negligent in printing the defama-
tory matter to recover actual damages (Docket No. 66177). The
defendant appeals.

In an opinion by Justice BRICKLEY, joined by Chief Justice
WILLIAMS and Justices LEVIN and ARCHER, the Supreme Court
*held:*

1. The statutory privilege to report public and official pro-
ceedings is intended to encompass at least the more limited
common-law privilege to report judicial proceedings. However,
an arrest that amounts to no more than an apprehension is not
a "proceeding" under the statute, and its report is not privi-
leged.

2. The common-law public-interest privilege formerly recog-
nized in Michigan largely has been subsumed in federal consti-
tutional law. Under the standard annunciated in *Gertz v
Robert Welch, Inc,* 418 US 323 (1974), a communication is not

REFERENCES

Am Jur 2d, Libel and Slander §§ 27 *et seq.,* 184, 192, 441, 442. See
the annotations in the Index to Annotations under Libel and
Slander.

constitutionally privileged if its subject involves a private person in the context of a matter of public interest. However, states may not impose liability without fault, or presume or impose punitive damages without a showing of malice. Thus, in an action for defamation involving a private-figure plaintiff, where the speech at issue is of public concern, negligence is the applicable standard for determining liability. Malice on the part of the defendant need not be shown.

3. A defendant in an action by a private figure for libel is not required to prove the truth of the report in its defense if the communication is speech of public concern; rather, the plaintiff must prove that the statements at issue were false in addition to proving that the defendant was negligent in reporting them. A report in a newspaper of an arrest of a private figure and of the facts used to establish probable cause for the arrest amount to speech of public concern.

Affirmed and remanded for further proceedings.

Justice CAVANAGH, concurring in part and dissenting in part, stated that it is fairly clear that the article at issue in this case contained false information. If there is no dispute regarding the article's falsity, the question who bears the burden of proving falsity becomes irrelevant. Thus, application of the rule that in a defamation case involving a private-figure plaintiff and speech of public concern the plaintiff has the burden of proving falsity is error. Moreover, while the report of an arrest might amount to speech of public concern, the surrounding details do not. In this case, it is exactly such details that the plaintiff finds false and defamatory; the details of the crime were merely matters that the public generally would find interesting, not speech of public concern. Such details did not contribute to the public's interest in reducing or detecting crime, but, rather merely maximized the damage to the plaintiff's reputation.

Justice BOYLE, joined by Justice RILEY, concurring in part and dissenting in part, stated that while in a defamation suit involving a media defendant and a private plaintiff, absent the application of any common-law privilege, a negligence standard is appropriate, without further factual findings, it cannot. be said that the official- and public-proceedings privilege is inapplicable in this case. All the common-law privileges traditionally available to all defendants, both media and otherwise, have not been subsumed in federal constitutional law and are still a vital part of the jurisprudence of this state.

137 Mich App 39; 357 NW2d 794 (1984) affirmed.

1. LIBEL AND SLANDER — NEWSPAPERS — PRIVATE PERSONS — REPORTS OF ARRESTS.

A report in a newspaper of an arrest of a private figure and of the facts used to establish probable cause for the arrest amounts to speech of public concern; a defendant in an action by a private figure for libel is not required to prove the truth of the report in its defense; rather, the plaintiff must prove that the statements at issue were false in addition to proving that the defendant was negligent in reporting.

2. LIBEL AND SLANDER — PRIVATE PERSONS — NEGLIGENCE.

The standard for determining liability for defamation of a private-figure plaintiff where the speech at issue is of public concern is not malice, but negligence.

3. LIBEL AND SLANDER — JUDICIAL PROCEEDINGS — REPORTS OF ARRESTS.

The statutory privilege to report public and official proceedings is intended to encompass at least the more limited common-law privilege to report judicial proceedings; however, an arrest that amounts to no more than an apprehension is not a "proceeding" under the statute, and its report is not privileged (MCL 600.2911[3]; MSA 27A.2911[3]).

*John M. Jereck* for the plaintiff.

*Nixon, Hargrave, Devans & Doyle* (by *Robert C. Bernius* and *Pamela J. Brown*) and *Sullivan, Hamilton & Schulz* (by *James M. Sullivan*) for the defendant.

Amici Curiae:

*Honigman, Miller, Schwartz & Cohn* (by *Herschel P. Fink*) for Detroit Free Press, Inc., and WXYZ, Inc.

*Keywell & Rosenfeld* (by *Dawn L. Phillips* and *Blair B. Hysni*) for Michigan Press Association.

*Butzel, Long, Gust, Klein & Van Zile, P.C.* (by *Richard E. Rassel* and *James E. Stewart*), for The Evening News Association.

BRICKLEY, J. In this case, arising out of an alleged false newspaper defamation of a private individual who was arrested but not formally charged for rape, it is necessary to determine the applicability of Michigan's statutory "public and official proceedings" statute, MCL 600.2911(3); MSA 27A.2911(3), and the viability of its common-law qualified public-interest privilege. Because this case was decided on the basis of summary judgment, only these privilege questions are before us.

## I. INTRODUCTION

The facts in this case are undisputed. On December 21, 1979, the Emmett Township police arrested the plaintiff, David J. Rouch, in connection with the rape of a woman in Bedford Township. At the time of the rape, the victim had been babysitting Mr. Rouch's step-children at his ex-wife's home. A standard incident report prepared by the Bedford Township Police Department indicated the name of the complaining party and victim, that Mr. Rouch was a suspect, that the "charge" was "CSC in the 1st degree," that the injury involved "penis/vaginal penitration [sic]," and that a "knife with approx. 6 inch blade" was used as a weapon. Although he was arrested, plaintiff in fact was never formally charged with the crime, and ultimately, someone else was. The Calhoun County Prosecutor's Office had apparently refused to issue a warrant after plaintiff's arrest.

On December 22, 1979, the defendant newspaper published the following article:

Police arrest suspect in baby-sitter assault.

A 43-year-old man has been arrested and charged with the sexual assault of a 17-year-old-women [sic] who was baby-sitting with his children

at his ex-wife's house on North Finlay Avenue in Bedford Township.

The suspect has been identified by Bedford Township police as David J. Rouch of 631 Golden Ave. He is free on a $10,000 personal recognizance interim bond pending his arraignment in District 10 Court next week. Rouch is charged with first-degree criminal sexual conduct.

Police said Rouch allegedly entered the house about 4 A.M. Friday and attacked the young woman. He is said to have used a knife to cut the victim's clothes off, police said.

The victim later called a relative, who took her to Community Hospital and then called police. The suspect was identified by his children, according to police.

Rouch was arrested at his home by Emmett Township police, who were informed where he lived by Bedford Township investigators.

The charge against Rouch was authorized Friday by the Calhoun County Prosecutor's Office.

The defendant's reporter had received the information contained in the article from the Bedford Township Police Department.

The reporter's affidavit indicated that he customarily telephoned the police department in the morning to receive information about newsworthy police activities during the preceding twenty-four hours. He indicated that, on the occasion in question, he had spoken with one or two officers and that he was informed of the details that were contained in the article. The reporter also said that he spoke with the Emmett Township police who confirmed that the arrest had been made. A year later, plaintiff commenced this action for libel.

The plaintiff's complaint alleged that the article was false and defamatory. In its motion for summary judgment, defendant argued that the article

was entitled to a qualified privilege under Michigan law, and that, in the absence of proof of malice, it could not be the basis of an action for libel. The trial court agreed. On June 14, 1982, Calhoun Circuit Judge Stanley Everett granted the defendant's motion for summary judgment of no cause of action. The order indicated that unless the plaintiff, within thirty days, established a genuine issue of material fact on the question of malice on the part of the defendant, the order would stand.

The trial court relied on *Schultz v Newsweek, Inc,* 668 F2d 911 (CA 6, 1982), a federal case interpreting Michigan law, as support for its finding of a qualified privilege. The court indicated that the privilege covers "matters of general public interest" and that the "reporting of arrests on criminal proceedings involving charges is a matter of general public interest."

The Court of Appeals reversed. *Rouch v Enquirer & News of Battle Creek,* 137 Mich App 39; 357 NW2d 794 (1984). Approaching the issue of privilege first from a constitutional perspective, the Court outlined the history of United States Supreme Court cases on the subject and concluded that

> there is no federal constitutional privilege to report on matters of public interest. [*Rouch, supra,* p 46.]

The Court observed that the majority of states that have ruled on the issue have adopted a negligence standard for determining whether a defendant is liable to a private-figure plaintiff for a defamatory falsehood. See *id.,* p 46, n 6.

Regarding the statutory qualified privilege contained in MCL 600.2911(3); MSA 27A.2911(3), the

Court held that because no warrant was issued in this case, there were no "official proceedings" and the statute was inapplicable. Referring to the general privilege to report judicial proceedings, the Court found that that privilege is limited to the fact of the arrest only, and not the "particular details of the alleged crime." *Id.,* p 48 (citing 3 Restatement Torts, 2d, § 611, comment h).

Finally, the Court considered the application of a common-law privilege to report matters in the public interest. It assumed the existence of such a privilege in Michigan, but found that the details contained in the instant article did not fall within the privilege. The Court reasoned,

> [T]here is an important distinction between matters which truly promote the public interest and matters which are merely interesting to the public. [*Id.,* p 51 (citing 3 Restatement Torts, 2d, § 598, comment b).]

The Court of Appeals concluded,

> [I]n Michigan, where, as here, the media defendants' publication is not wrapped in a qualified privilege, a private-figure plaintiff need only prove negligence in order to prevail.
>
> In the present case, the details of plaintiff's alleged crime were merely matters that the public would find generally interesting and not matters "deserving of robust public debate." The fact that plaintiff had been arrested for raping his ex-wife's teenage baby sitter and cutting off the baby sitter's clothes with a knife does not contribute to the public's interest in reducing or detecting crime. Instead, it merely maximizes the damage to plaintiff's reputation. Thus, considering the obvious harm to plaintiff's reputation, we conclude that the balance should be struck in plaintiff's favor. [*Id.,* pp 58-59.]

Thus, the Court held

> that the trial judge erred by ruling that plaintiff
> must show that defendant possessed malice when
> it printed its article. Instead, plaintiff need only
> show that defendant was negligent in printing the
> defamatory matter in order for plaintiff to recover
> his actual damages. [*Id.*]

Defendant appealed to this Court, and leave was granted on June 26, 1985. 422 Mich 937 (1985).

## II. THE STATUTORY OFFICIAL PROCEEDINGS PRIVILEGE

Because, if it is applicable, it would determine the outcome of this case, we first discuss the "official proceedings privilege" statute, MCL 600.2911(3); MSA 27A.2911(3). The relevant provisions of that statute read:

> No damages shall be awarded in any libel action
> brought against a reporter, editor, publisher, or
> proprietor of a newspaper for the publication in it
> of a fair and true report of any public and official
> proceeding . . . .

Although the statute was enacted in 1931, its origins may be traced to much earlier Michigan common law. In 1882, this Court summarized the various common-law privileges available at the time. We described what may be termed a privilege to report judicial proceedings:[1]

> [T]he publication of judicial proceedings taken
> before magistrates is privileged to the same extent
> as the proceedings of the trial court . . . . [*Miner*

---

[1] This privilege is qualified, and should be distinguished from the absolute privilege that covers what is said during the course of judicial proceedings. The latter privilege is obviously not claimed in this case, nor is it applicable.

*v Detroit Post & Tribune Co,* 49 Mich 358, 359; 13
NW 773 (1882).]

The privilege was invoked in *Jastrzembski v
Marxhausen,* 120 Mich 677; 79 NW 935 (1899),
which involved an article concerning the plaintiff's
alleged elopement with a woman other than his
wife. The newspaper claimed the privilege because
the story was based on a verbal complaint made
by the plaintiff's wife to a police officer. We noted
that "[t]he only document filed in the justice's
court was a complaint made for nonsupport, and
this was not known to the reporters or to defen-
dant." *Id.,* p 680. Thus, we held that the privilege
did not apply in that "[t]he statements published
were not gathered from any proceedings in court,
but the information was obtained from parties
entirely outside of any court." *Id.,* p 682.

The common-law privilege to report judicial pro-
ceedings was again claimed in *Sherwood v Evening
News Ass'n,* 256 Mich 318; 239 NW 305 (1931), but
was held not to cover the facts of that case. In
*Sherwood,* we noted,

>    It is well settled that a faithful and fair report
> of the proceedings in courts of justice [is] privi-
> leged, even though the reputation of individuals
> incidentally suffer[s] from [its] publication . . . .
> [*Id.,* p 320.]

In *Sherwood,* defendant's article had alleged
that the plaintiff had participated in a gun fight
with the police, had been wounded, had stolen a
car to escape, and had been caught and put in jail.
In the words of the Court,

>    Plaintiff was not the bandit, did not participate
> in the gun battle, was not shot, did not steal a car,
> was not arrested, or sent to jail. [*Id.,* p 319.]

The issue was whether the defendant, absent malice, was "privileged in publishing a true, a fair, and accurate statement of information received from the sheriff and his deputies concerning the official acts of such public officers?" *Id.* Relying on applications of similar qualified privileges from other states, and on *Davis v Marxhausen,* 86 Mich 281; 49 NW 50 (1891), after remand 103 Mich 315; 61 NW 504 (1894), *Clair v Battle Creek Journal Co,* 168 Mich 467; 134 NW 443 (1912), and *Jastrzembski, supra,* we held that the jury instructions were "more favorable than defendant was entitled to." *Sherwood,* p 325. The instructions had stated:

> When a newspaper fairly and without malice or intent to harm, publishes the progress being made in a criminal matter upon the information received from peace officers in charge of the examination involving crime, the articles so published are qualifiedly privileged, and the newspaper would not be liable in damages. [*Id.*]

The statute, of course, is not limited to judicial proceedings, but refers to "any public and official proceeding." Only one Michigan case has actually construed this language.

In *McCracken v Evening News Ass'n,* 3 Mich App 32; 141 NW2d 694 (1966), the Court of Appeals applied the statutory privilege in a case that is factually similar to the case at bar. It referred to the statutory privilege as a qualified one.

In *McCracken,* the plaintiff was a subcontractor on a building addition to a VA hospital. An employee of the general contractor on the project had signed a complaint against the plaintiff, alleging felonious execution and delivery of an allegedly false certificate that certain materials were in

plaintiff's possession. A warrant was issued and the defendant published an article about the affair, quoting the warrant and comments made by the assistant prosecutor.

The Court found the privilege applicable. It held that the slight inaccuracy in the article did not amount to an abuse of the statutory privilege and ruled in favor of the defendant.

However, the Court made the following observations:

> The statute protects newspaper publishers if the article is a fair and true report of the public and official proceeding. The fact that the reporter herein relied on the word of another as to the nature of the complaint and warrant is immaterial. The statute does not command the reporter to obtain his information from the official court records. At his risk, and at the risk of his publisher, he may rely upon the word of another as to the contents of the complaint and warrant, and that it will be so issued if it has not already been. If the information thus obtained and published does not substantially represent the matter contained in the court records, then the question arises as to whether or not the publisher has abused his privilege. The abuse of the privilege is a question of fact for the trier of fact to determine. *Obviously, if a warrant is never issued, there are no official proceedings that can be reported and this statute is not applicable.* [*Id.,* pp 38-39. Emphasis added.]

The Court of Appeals in *Rouch* found the arrest privileged under the statute, but the supporting information from the police officers outside the privilege. We agree that the statute does not apply, but under a different analysis.

It has not been made known to us whether, in adopting this statute in 1931, the Legislature wished to codify the common-law privilege to re-

port judicial proceedings,[2] and intended that the word "proceedings" refer only to judicial proceedings, or whether a broader scope was intended.

In support of its finding that the arrest was privileged, but that the supporting information was not, the Court of Appeals quoted three sources. See *Rouch, supra,* pp 48-49. The Restatement of Torts states:

> The publication of defamatory matter concerning another in a report of an *official action* or proceedings or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported. [3 Restatement Torts, 2d, § 611. Emphasis added.]

The Court quoted comment h to that section:

> An arrest by an officer is an *official action,* and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section. On the other hand statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section. [Emphasis added.]

[2] Justice BOYLE would apply a much broader common-law privilege to this case to cover the reporting of official actions. See *post,* p 220, n 15. Such a general reporting privilege may have been adopted by other states, but has never been recognized in Michigan. In addition, there is no indication, either from the words of the statute or the legislative history, that our Legislature intended to enact a broad reporting privilege.

Even if the common-law privilege that existed prior to the enactment of MCL 600.2911(3); MSA 27A.2911(3) may be characterized as a privilege to report on official or public proceedings, that assumption does not alter our basic conclusion that an arrest without a warrant does not amount to an official or public proceeding.

It also cited Prosser, Torts (4th ed), § 118, pp 831-832:

> Thus it is the prevailing view, with some few courts to the contrary, that a pleading or a deposition filed in a case but not yet acted upon may not be reported under the claim of privilege. . . .
>
> The same is of course true of the preliminary statements of police, or any other evidence not yet given.

The Court also relied upon 1 Harper & James, Torts, § 5.24, p 433:

> [T]he publication of a petition, an answer, a deposition or an affidavit before a hearing has been held, does not receive the protection of privilege. The same is true, as a general rule, of investigations and other activities of the police before a warrant is issued or any other official action taken. [*Id.*, p 49, n 8.]

We cannot agree with the Court of Appeals use of these authorities.[3] The Restatement deals with a privilege ("official *action*") broader than either our common-law privilege to report judicial proceedings or the statutory "public and official proceedings" privilege. Accordingly, it is not helpful in our effort to interpret the statute.[4] The quotations from Prosser and Harper & James do relate to

[3] Justice BOYLE also relies on these authorities, but cites no Michigan case indicating that this state has adopted their version of this privilege.

[4] Because we find the privilege described in § 611 of the Restatement to be broader than contained in MCL 600.2911(3); MSA 27A.2911(3), we likewise do not find comment d to that section helpful in construing the statute. Comment d notes:

> The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege. [3 Restatement Torts, 2d, § 611, comment d.]

judicial-proceedings privileges, but do not support the inclusion of either the arrest or the supporting "charge" under such a privilege.

Although we have not spoken on the question whether an arrest is a "judicial proceeding," others have, and generally, they have not found it to be the case. See, e.g., *Lancour v Herald & Globe Ass'n*, 111 Vt 371, 384-386; 17 A2d 253 (1941); *Turnbull v Herald Co*, 459 SW2d 516, 520 (Mo App, 1970).

A few cases have construed the meaning of "official," as opposed to "judicial," proceeding as it relates to a privilege governing the reporting of the same. The rationale for a "public proceedings" privilege is basically the same as that offered in favor of the judicial-proceedings privilege.

> The privilege rests upon the idea that any member of the public, if he were present, might see and hear for himself, so that the reporter is merely a substitute for the public eye—this, together with the obvious public interest in having public affairs made known to all. [Prosser & Keeton, Torts (5th ed), § 115, p 836.]

In *Phillips v Evening Star Newspaper Co*, 424 A2d 78 (DC App, 1980), cert den 451 US 989 (1981), the District of Columbia Court of Appeals, applying the privilege to report official actions or proceedings as enunciated in § 611 of the Restatement, held that it did not apply to information obtained from a police "hot line." The court noted that

[t]his log representing the oral police communica-

---

If our statutory privilege covered "official action," then this comment might be used to include the standard-incident report filed in this case within the meaning of official action, and thereby render privileged defendant's report of that action. Such is not the case, however.

tion from which the [newspaper] composed its
article does not carry the dignity and authoritative
weight as a record for which the common law
sought to provide the reporting privilege. [*Id.*, p
89.]

Broader privileges have included arrests and
information given to a law enforcement official.
See *Lotrich v Life Printing & Publishing Co*, 117
Ill App 2d 89; 253 NE2d 899 (1969) (an official
government proceedings and records privilege ap-
plies to police files). See also *Lulay v Peoria Jour-
nal-Star, Inc*, 34 Ill 2d 112; 214 NE2d 746 (1966)
(governmental-affairs privilege applicable to a re-
port of a health department inspection); *Gawel v
Chicago American Publishing Co*, 1 Ill App 3d 481;
274 NE2d 628 (1971) (governmental-affairs privi-
lege covered misidentification of arrestee based on
information from police and jail officials).

We think a fair reading of the "public and
official proceedings" language of the instant legis-
lation would dictate that it is intended to cover at
least the more limited common-law privilege to
report judicial proceedings, but is not by its very
language intended to be a "government action,"
"arrest record," or "public records" privilege.[5] If

_____

[5] The *Phillips* court contrasted the "hotline" with an actual arrest
record.

> Not being an arrest record nor a record required by statute
> or some other authority, but instead merely constituting a
> hearsay statement by police of facts of a case, the hot line will
> not qualify as an official record for purposes of this privilege.
> [*Id.*, p 89.]

We do not read MCL 600.2911(3); MSA 27A.2911(3) as including a
"public records" privilege within its reference to "public and official
proceedings."

Other states hold that reports of arrests are privileged, but they do
so pursuant to specific privileges governing arrest reports or "public
reports," generally. See, e.g., *Commercial Publishing Co v Smith*, 149
F 704, 706 (CA 6, 1907); *François v Capitol City Press*, 166 So 2d 84,

such a broader scope had been intended, the necessary words could easily have been employed.

Black's Law Dictionary (5th ed), defines "proceeding" in part as follows:

> In a general sense, the form and manner of conducting juridical business *before a court or judicial officer.* Regular and orderly progress in form of law, including all possible steps in an action from its *commencement to the execution of judgment.* . . .
>
> An act which is done *by the authority or direction of the court, agency, or tribunal,* express or implied; an act necessary to be done in order to obtain a given end; a prescribed mode of action for carrying into effect a legal right. . . . The proceedings of a suit embrace all matters *that occur in its progress judicially.* [Emphasis added.]

The words "official proceeding" evoke notions of adjudicatory action, rather than of government action generally. The term "official proceeding" may be broader than "judicial proceeding,"[6] but does not in our view encompass all actions of all government officials.[7]

We conclude that an arrest that amounts to no more than an apprehension is not a "proceeding"

89 (La App, 1964); *Piracci v Hearst Corp,* 263 F Supp 511, 513 (D Md, 1966). It is not suggested by the parties, nor has our research indicated, that Michigan has such a privilege. Moreover, the language of the official proceedings statute is not broad enough to include such a privilege within its meaning.

The defendant claims that the information at issue here was part of the police report, even though it was received orally from the officers, and therefore privileged. For the same reason that an arrest is not covered, neither is the police record of the arrest. We are not dealing here with a public-record privilege.

[6] Administrative and quasi-judicial proceedings may be included, but we do not find it necessary to make that determination in this case.

[7] We note that such a broad reading of the statute to cover all government actions would have largely duplicated the scope of the common-law public-interest privilege discussed below.

under the statute. Accordingly, the information orally furnished to the defendant in support of it does not, as such, enjoy the privilege afforded by the "public and official proceedings" statute.[8]

## III. THE PUBLIC-INTEREST PRIVILEGE

### A. HISTORY

We next address the defendant's contention that, in the absence of the application of the statutory privilege, Michigan's long-recognized qualified public-interest privilege protects this publication and its alleged factual errors in the absence of malice. If such a privilege is applicable, plaintiff would be required to prove that defendants published the report with knowledge of its falsity or with reckless disregard for the truth.[9] Plaintiff would be required to show malice in addition to the elements necessary to demonstrate liability for defamation:

(a) a false and defamatory statement concerning plaintiff; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionabil-

---

[8] Defendant's argument that "accurate reporting of public records . . . is constitutionally protected" is based on *Cox Broadcasting Corp v Cohn*, 420 US 469; 95 S Ct 1029; 43 L Ed 2d 328 (1975), in which the accurate identity of a victim of a sexual assault was secured from an official report and was, therefore, privileged from invasion of privacy liability. This argument is misplaced because the authority supports a constitutional defense of truth and absence of fault, rather than, as alleged here, a defense of privilege in the face of an alleged defamatory publication.

[9] In *Arber v Stahlin*, 382 Mich 300; 170 NW2d 45 (1969), we held that the existence of "actual malice," defined as knowledge of falsity or reckless disregard of the truth, is a question of fact. Since we are abandoning the former common-law qualified public-interest privilege, it is unnecessary in this case to make any distinction between the constitutional and common-law definitions of malice. See *Peisner v Detroit Free Press*, 421 Mich 125, 137, n 12; 364 NW2d 600 (1984) (*Peisner II*).

ity of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation *per quod*). [3 Restatement Torts, 2d, § 558. *Postill v Booth Newspapers,* 118 Mich App 608, 618; 325 NW2d 511 (1982).]

In advance of this analysis, it is important to set forth what the lower courts have *not* found and as a result, what this case is *not* about. It has not been found that the newspaper report of the plaintiff's arrest and the reasons for the arrest were false. Nor has it been found that, if false, there is liability resulting from negligence. Finally, were there a finding of falsity and negligence, there has been no finding that the plaintiff was damaged thereby.

The question presented is whether the trial court was in error in denying the plaintiff an opportunity to prove that the publication was false, that the falsity resulted from a standard of fault less than malice, and that the plaintiff was damaged thereby.[10] The Court of Appeals acknowledged the existence of a public-interest privilege, but it differentiated between matters that "pro-

---

[10] We take special care to articulate the exact questions before us in response to hyperbolical statements of defendant and amicus curiae as to the effect of the judgment of the Court of Appeals. (E.g., "Rather, the plaintiff's libel case is ultimately premised on the theory that the Enquirer & News may be held liable to the plaintiff for accurately reporting his arrest because the plaintiff was not ultimately found guilty of the crimes for which he was arrested.")

In short, the Court of Appeals held that a news organization that accurately reports on a person's arrest, the felony charges brought against that person, and the reasons for the arrest and charge is subject to a defamation action over that accurate reporting unless the person is ultimately proven to be guilty of the crime beyond a reasonable doubt. [Amicus brief in support of defendant-appellant by the Evening News Association, Detroit Free Press, Inc., and WXYZ, Inc.]

mote the public interest and matters which are
merely interesting to the public," finding the ar-
rest in this case to fall within the latter category.
It therefore declined to apply the privilege. We
again arrive at the same result, but by way of a
different analysis.

The qualified privilege to report on matters in
the public interest is deeply rooted in Michigan
jurisprudence. A qualified privilege, generally, pro-
vides

> a conditional right to publish otherwise defama-
> tory remarks because the defendant is advancing
> some interest of social importance. . . . Where a
> qualified privilege exists, plaintiff, in order to re-
> cover, must affirmatively prove actual malice on
> the part of the defendant. [*Walker v Cahalan,* 97
> Mich App 346, 356; 296 NW2d 18 (1980), citing
> *Lawrence v Fox,* 357 Mich 134; 97 NW2d 719
> (1959).]

In *Miner v Detroit Post & Tribune Co, supra,*
this Court's earliest expression on the subject, a
public official ("police justice" of the City of De-
troit) claimed to have been harmed by a newspa-
per article. Justice COOLEY, in approving of the
privilege that distinguishes matters of public inter-
est from mere gossip, reasoned:

> I know of nothing more likely to encourage the
> license of a dissolute press than to establish the
> principle that the discussion of matters of general
> concern involving public wrongs and the publica-
> tion of personal scandal come under the same
> condemnation in the law; for this inevitably brings
> the law itself into contempt and creates public
> sentiment against its enforcement. [*Miner, supra,*
> p 364.]

Closely thereafter, in *Bacon v Michigan Central*

*R Co,* 66 Mich 166; 33 NW 181 (1887), we said that
a qualified privilege was held to

> extend[ ] to all communications made *bona fide*
> upon any subject-matter in which the party com-
> municating has an interest, or in reference to
> which he has a duty, to a person having a corre-
> sponding interest or duty. And the privilege em-
> braces cases where the duty is not a legal one, but
> where it is of a moral or social character of imper-
> fect obligation. [*Id.,* p 170.]

The "duty" in that case ran to the defendant
railroad employee, who had published an internal
report noting that the plaintiff had been dis-
charged for stealing. The Court reasoned that the
employee who made the communication owed a
duty to the company in the capacity of personnel
agent. We observed:

> It is not only proper, but it is of the utmost
> importance to the company, and to the public
> having business transactions with it, that the ser-
> vants employed by it shall be men of good
> character . . . . [*Id.,* p 171.]

In applying the duty/interest privilege, some-
what different from the public-interest privilege,
the *Bacon* Court noted that "[t]he occasion deter-
mines the question of privilege. The language is
only proper to be considered in connection with
the question of malice." *Id. Bacon* also emphasized
that "[t]he great underlying principle upon which
the doctrine of privileged communication stands, is
public policy." *Id.,* p 169.

In a line of cases following *Bacon,* we continued
to adhere to those privileges. The latest discus-

sion[11] of the public-interest privilege to emerge from this Court appears in *Lawrence v Fox,* 357 Mich 134; 97 NW2d 719 (1959).[12]

In *Lawrence,* the deputy superintendent of police in Detroit sued several newspapers for the publication of a series of articles charging him with fraud, corruption, and various other violations of the public trust. Plaintiff asserted the falsity of the charges and maintained that defendants had acted in bad faith and out of a desire to "ruin him."

After tracing the historical roots of privilege in defamation law and noting that privilege necessarily "rests upon considerations of public policy," *id.,* p 137, we once again observed that

> [t]he occasion determines the question of privilege. The language is only proper to be considered in connection with the question of malice. [*Id.,* p 140.]

We further observed:

> There is no need, at this date in our history, to urge that it is necessary to free institutions that the press itself be free. Today it is. The real issue before us is how free. Governmental interference is not the only threat to its freedom. On the contrary, a narrow or restrictive interpretation of the law of privilege in libel actions is equally dangerous. The publisher often faces a cruel dilemma: The more serious the charge of wrongdoing by a public official, more urgent the need for

---

[11] It was our last treatment of the subject, except for a brief reference to it in *Peisner v Detroit Free Press,* 421 Mich 125; 364 NW2d 600 (1984) (*Peisner II*), discussed below.

[12] In *Lawrence,* only three justices signed the majority opinion. The remaining three participating justices concurred in the result only.

In contrast to Justice BOYLE, we do not believe that *Lawrence* applied the fair-comment privilege. *Lawrence* is generally cited as, and we also find it to be, the most recent articulation of the public-interest privilege by this Court.

its airing. Yet, the more serious the charge, the greater the libel. It is in this uneasy and menacing situation that the law provides the publisher a sanctuary of sorts, the defense of privilege. [*Id.,* p 137.]

Thus, at the time we decided *Lawrence,* in 1959, the public-interest privilege applied to an "occasion," not to the status of the parties, even though the principle cases dealing with this privilege involved public official plaintiffs. The "policy" to be achieved was obvious, although not often articulated: encouragement of a free flow of information about public concerns. Also at that time, the constitutional dimensions of the law of defamation could be simply stated: "[L]ibelous utterances are not within the area of constitutionally protected speech." *Roth v United States,* 354 US 476, 483; 77 S Ct 1304; 1 L Ed 2d 1498 (1957). As Justice White noted in 1974,

For some 200 years—from the very founding of the Nation—the law of defamation and right of the ordinary citizen to recover for false publication injurious to his reputation have been almost exclusively the business of state courts and legislatures. [*Gertz v Robert Welch, Inc,* 418 US 323, 369-370; 94 S Ct 2997; 41 L Ed 2d 789 (1974).]

In *New York Times v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), the constitutionally dictated change in the state of libel law began when the United States Supreme Court held that the constitutional guarantees of the First and Fourteenth Amendments required a rule prohibiting "a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice,'" defined as knowledge

of falsity or reckless disregard for the truth. *Id.,* pp 279-280. Thus, the United States Supreme Court in *New York Times* focused on the status of the plaintiff when it created the constitutional standard.

*Curtis Publishing Co v Butts,* 388 US 130; 87 S Ct 1975; 18 L Ed 2d 1094, reh den 389 US 889 (1967), continued the focus on the status of the plaintiff when it extended application of the *New York Times* standard to cases involving public-*figure* plaintiffs. Public figures were defined by a concurring justice as nonpublic officials who "are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Id.,* p 164 (Warren, C.J., concurring in result).

In the next relevant case, *Rosenbloom v Metromedia, Inc,* 403 US 29; 91 S Ct 1811; 29 L Ed 2d 296 (1971), the Court, in a plurality opinion, departed, *albeit* briefly, from using the status of the plaintiff as a criterion for constitutional protection from libel in the absence of malice. Justice Brennan, writing for the plurality, noted:

> If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not "voluntarily" choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety. [*Id.,* p 43.]

Although qualified privileges for the protection of mass-media defendants existed in some states prior to the *New York Times* case, they were "limited by numerous restrictions and were often

narrowly construed." *AAFCO Heating & Air Conditioning Co v Northwest Publications, Inc,* 162 Ind App 671; 321 NE2d 580 (1974), cert den 424 US 913 (1976). They "traditionally recognized only statements of opinion as privileged; false statements of fact were never privileged." *Id.,* p 675.

However, Michigan was one of those states that had more than a fair-comment privilege.[13] It extended protection to nonmalicious errors of fact when they involved matters of public concern, at least when the case involved a public plaintiff.[14] With the release of the *Rosenbloom* opinion, Michigan's public-interest privilege was definitely subsumed within the constitutional ambit. In a case such as that before us, the only issue under *Rosenbloom* would have been whether the report of the arrest was within the public interest.

Our task in this case, however, has been compli-

[13] The "fair comment" privilege must be distinguished from the public-interest privilege at issue here. Although federal courts applying Michigan law have sometimes confused the fair-comment privilege with the qualified public-interest privilege, see, e.g., *Schultz v Reader's Digest Ass'n,* 468 F Supp 551, 562 (ED Mich, 1979); *Orr v Argus-Press Co,* 586 F2d 1108, 1111 (CA 6, 1978), the fair-comment privilege "is involved only where the matter complained of is comment, as distinguished from statement of fact." Harper & James, *supra,* § 5.26, p 449.

> The principle of "fair comment" affords legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact. [*Id.,* § 5.28, p 456.]

The defendant's article about Mr. Rouch was a factual report, not an expression of opinion.

We obviously disagree with Justice BOYLE's belief that the fair-comment privilege is somehow part of the public-interest privilege. See *post,* p 210. It is a completely separate privilege which is inapplicable to this case and is unaffected by the analysis advanced here. Our finding that the public-interest privilege has been partially subsumed in the constitutional privilege, and is no longer necessary in Michigan, has no bearing on the continuing viability of other common-law privileges not addressed here.

[14] Whether the Michigan public-interest cases were limited to public-official plaintiffs is discussed below.

cated by the Supreme Court's withdrawal from
*Rosenbloom* in *Gertz, supra. Gertz* held:

> [S]o long as they do not impose liability without
> fault, the States may define for themselves the
> appropriate standard of liability for a publisher or
> broadcaster of defamatory falsehood injurious to a
> private individual. [*Id.,* p 347.]

The *Gertz* Court also held "that the States may not
permit recovery of presumed or punitive damages,
at least when liability is not based on a showing of
knowledge of falsity or reckless disregard for the
truth." *Id.,* p 349.

In the most recent United States Supreme Court
case on the subject, the constitutional privilege
was further defined. *Philadelphia Newspapers, Inc
v Hepps,* 475 US —; 106 S Ct 1558; 89 L Ed 2d 783
(1986), held that, in a defamation case involving a
private-person plaintiff, but speech of public con-
cern, the plaintiff must bear the burden of proving
falsity. A Pennsylvania statute had required the
defendant to bear the burden of proving truth in
all cases. The Court clarified that "[w]hen the
speech is of exclusively private concern and the
plaintiff is a private figure, . . . the constitutional
requirements do not necessarily force any change
in at least some of the features of the common-law
landscape." *Id.,* 89 L Ed 2d 792. In the area of
burden of proof, then, the Court has shifted its
focus somewhat from the status of the plaintiff to
the subject of the speech.

Thus, in a relatively short period of time, during
which we have not had an opportunity to revisit
the qualified public-interest privilege question, the
law of libel has been significantly altered. Much of
what was the policy-based law of libel in Michigan
prior to *New York Times* and its progeny, has now

become constitutionally mandated. How much in the way of privilege remains outside of the constitutional ambit and what to do with it is the issue that now requires our attention.

Although our pronouncements have never explicitly limited application of the public-interest privilege to a public official or a public figure, it is also true that we have never applied the privilege in a case involving a strictly private-person plaintiff. *Miner v Detroit Post & Tribune Co, supra* (plaintiff was a "police justice" of the City of Detroit; *Fortney v Stephan,* 237 Mich 603; 213 NW 172 (1927) (plaintiff was a sheriff); *Timmis v Bennett,* 352 Mich 355; 89 NW2d 748 (1958) (plaintiff was a police department employee); *Lawrence v Fox, supra* (plaintiff was a deputy superintendent of police).[15]

Also, in *Lawrence* and other cases, our analysis relied to some extent on the status of the plaintiff as a public official.

> The immunity of the conditional privilege, then, fragile though it may be, is not without value to the defendant charged with defamation. The newspaper (or any) publisher, commenting upon the performance of duties *by a public official,* stands before the jury initially (unlike the malevolently officious fishwife) wearing his vulnerable cloak of privilege. It is the plaintiff's burden to destroy it, to prove such abuse that the privilege is lost. [*Lawrence, supra,* pp 143-144. Emphasis added.]

Likewise in *Timmis, supra,* p 369, we emphasized that the communication was one criticizing "the

---

[15] Although *Bacon, supra,* involved a private-person plaintiff, it is questionable whether in that case a "public interest" privilege was applied. Rather, the privilege that protected the defendant personnel agent in *Bacon* may be termed a "shared interest" privilege, which is founded on the need to share information about private persons in commercial or other relationships.

acts of members of the police department." Thus, *Miner, Fortney, Timmis,* and *Lawrence* all involved persons who would now likely be considered "public officials or figures" under the constitutional standard. Those cases are arguably limited to situations involving public plaintiffs.

Such is not the case in the Michigan Court of Appeals, however. That Court has moved beyond *Lawrence* and the earlier cases discussed, and it has explicitly recognized a qualified privilege to report on matters of public interest in cases involving *private*-figure plaintiffs. See *Peisner v Detroit Free Press,* 82 Mich App 153; 266 NW2d 693 (1978) (interlocutory appeal) (*Peisner I*). The federal courts, applying Michigan law, have accepted *Peisner I* as the law of Michigan. See *Bichler v Union Bank & Trust Co,* 745 F2d 1006, 1011 (CA 6, 1984) (en banc); *Schultz v Reader's Digest Ass'n,* 468 F Supp 551, 561 (ED Mich, 1979); *Apostle v Booth Newspapers, Inc,* 577 F Supp 962 (WD Mich, 1984). However, the same courts were careful to note that this Court had not spoken on the privilege since either *New York Times* or *Gertz.*

In *Peisner,* the plaintiff lawyer sued the defendant newspaper for libel on the basis of an article dealing with court-appointed lawyers that had accused the plaintiff of "inadequate representation of an indigent criminal defendant in appellate proceedings and with unethical conduct." *Peisner v Detroit Free Press,* 104 Mich App 59, 62-63; 304 NW2d 814 (1981), aff'd but modified 421 Mich 125; 364 NW2d 600 (1984) ("malice" and damages issues) (*Peisner II*).

In *Peisner I,* which is the decision most relevant to the issue presented in the instant case, the defendant had claimed both the constitutional privilege, alleging that plaintiff was a "public figure," and the qualified privilege "on the grounds

that the controversy was a matter of widespread public interest . . . ." *Peisner I,* p 156. The defendant had further claimed that the plaintiff had not shown abuse of the privilege, in that he had not alleged facts from which malice could be inferred.

The Court of Appeals held that plaintiff Peisner was not a public figure as defined in *Gertz, supra.* It found the trial court's reason for finding him to be a public figure—the fact that "he was appointed to handle a criminal appeal"—to be an insufficient basis for that finding. *Id.,* p 160.

As to the qualified privilege, the Court of Appeals cited the leeway granted to state courts in *Gertz,* and relied upon our earlier cases of *Bacon, Timmis,* and *Lawrence* in finding the privilege applicable to a private-figure plaintiff.[16] It noted:

> Although [*Lawrence*] involved an article charging a public official with fraud and corruption, it is clear that it was not limited to publications concerning public officials . . . . [*Id.,* p 161.]

The Court approved of the trial judge's holding

> that the public's interest in the administration of justice gave rise to a qualified privilege to report on events affecting a judicial proceeding. [*Id.,* p 163.]

The panel in *Peisner I* found that a question of fact remained regarding the existence of malice, however, and it remanded for a trial on that issue. The definition of malice and the damages issue were appealed in *Peisner II,* which reached this Court.

Thus, it was *Peisner I* that expressly expanded

---

[16] But see the text at n 11: plaintiffs in the cited cases were all public persons.

the scope of the qualified privilege to encompass cases involving private-figure plaintiffs such as Mr. Rouch. The question of privilege was not appealed in *Peisner II,* and therefore, the instant case represents this Court's first opportunity to approve or disapprove of the privilege, interpreted by the Court of Appeals and by the federal courts applying Michigan law, as applicable in cases involving nonpublic plaintiffs.

As noted above, if one were to consider only the cases of this Court, there would be very little evidence of a public-interest privilege applicable in cases involving private-defamation plaintiffs. However, in *Peisner II,* we acknowledged the privilege as enunciated by the Court of Appeals.

*Peisner II* held that exemplary and punitive damages for libel may be awarded only upon a finding that defendant acted with common-law malice, defined as ill will or bad faith. However, in the process of deciding the issues presented in that case, this Court

> [r]ecognize[d] that a private defamation plaintiff must face an imposing array of barriers to recover exemplary and punitive damages. In this case, for example, plaintiffs were required to prove constitutional "actual malice"—*i.e.,* knowledge of falsity or reckless disregard for the truth—*simply to defeat defendants' qualified privilege to report on matters in the public interest* and thereby establish liability for actual damages. [*Id.,* 421 Mich 137.]

The defendant points to our language in *Peisner* as an implicit acceptance of the *Rosenbloom* standard as a matter of Michigan common law.

Other Court of Appeals cases have also recognized the private-person public-interest privilege. However, some, like the panel in this case, found

the subject matter to be outside the scope of the public-interest privilege.

In *Weeren v Evening News Ass'n,* 2 Mich App 74; 138 NW2d 526 (1965), rev'd on other grounds 379 Mich 475; 152 NW2d 676 (1967), the Court of Appeals applied the privilege in a case involving the defendant television station's airing of a documentary about the circumstances surrounding plaintiff's donation of a bell to a leper colony. The Court also recognized the privilege in *Postill v Booth Newspapers, supra,* however, because that case was brought by a public-official plaintiff (the Washtenaw County Sheriff), it comports with this Court's narrower definition of the privilege. *Gaynes v Allen,* 128 Mich App 42; 339 NW2d 678 (1983), represents an expansive interpretation of the privilege. In that case, the Court of Appeals applied it to a case involving a publication about the private plaintiff's alleged incompetency in the profession of optometry. Likewise, in *Dienes v Associated Newspapers, Inc,* 137 Mich App 272; 358 NW2d 562 (1984), a Court of Appeals panel applied the privilege in a case involving a news report about the health of a private-person plaintiff's cows. In *Nabkey v Booth Newspapers,* 140 Mich App 507; 364 NW2d 363 (1985), the panel recognized the privilege, but cited *Rouch* and declined to apply it to the defendant newspaper's alleged false report of the details of the plaintiff's arrest and arraignment: "[T]he report of plaintiff's alleged activity did not contribute to the public's interest in reducing or detecting crime, but merely provided interesting or amusing reading for the public." *Id.,* p 513. Finally, in *Kurz v Evening News Ass'n,* 144 Mich App 205; 375 NW2d 391 (1985), another panel applied the privilege to a case involving a newspaper report about the plain-

tiff's (a Detroit attorney) arraignment on charges of assaulting a police officer.

Whether the Court of Appeals is correct in interpreting our pre-*New York Times* public-interest privilege decisions as covering nonpublic persons is less important than what the state of the law ought to be in the wake of a veritable revolution in First Amendment defamation law. It is from this broader perspective that we consider the issue presented.

### B. ANALYSIS OF THE PUBLIC-INTEREST PRIVILEGE

In this section, we address the fundamental question after *Gertz:* Should there be a qualified public-interest privilege applicable in cases involving nonpublic plaintiffs that is more protective than the constitutional minimum requirements now in place for publications involving both private and public persons? We answer that question in the negative and hereby adopt the *Gertz* negligence standard in such cases. We decline the opportunity to create further tests and standards to be applied in libel cases involving claims of a public-interest privilege, when the constitutional standard more than adequately addresses the policy concerns that prompted our formulation of the common-law privilege in the nineteenth century and that would militate in favor of one at this time were there inadequate constitutional protection. Our decision is in keeping with the majority of states that have considered this question, and comports with a careful balancing of the very weighty policy concerns that necessarily influence a decision in the area of libel privilege.

### 1. FOREIGN JURISDICTIONS

Our survey of states that have responded to the

*Gertz* challenge indicate that twenty-three states and the District of Columbia have expressly adopted the *Gertz* negligence standard as a matter of state law.[17] Eight states have assumed without

[17] ARIZONA:
*Peagler v Phoenix Newspapers, Inc,* 114 Ariz 309; 560 P2d 1216 (1977);

ARKANSAS:
*Dodrill v Arkansas Democrat Co,* 265 Ark 628; 590 SW2d 840 (1979), cert den 444 US 1076 (1980);

DISTRICT OF COLUMBIA:
*Phillips v Evening Star Newspaper Co,* 424 A2d 78 (DC App, 1980), cert den 451 US 989 (1981);

FLORIDA:
*Miami Herald Publishing Co v Ane,* 423 So 2d 376 (Fla App, 1982);

HAWAII:
*Cahill v Hawaiian Paradise Park Corp,* 56 Hawaii 522; 543 P2d 1356 (1975);

ILLINOIS:
*Troman v Wood,* 62 Ill 2d 184; 340 NE2d 292 (1975);

KANSAS:
*Gobin v Globe Publishing Co,* 216 Kan 223; 531 P2d 76 (1975);

KENTUCKY:
*McCall v Courier-Journal & Louisville Times Co,* 623 SW2d 882 (Ky, 1981), cert den 456 US 975 (1982);

LOUISIANA:
*Wilson v Capital City Press,* 315 So 2d 393 (La App, 1975);

MARYLAND:
*Jacron Sales Co, Inc v Sindorf,* 276 Md 580; 350 A2d 688 (1976);

MASSACHUSETTS:
*Stone v Essex Co Newspapers, Inc,* 367 Mass 849; 330 NE2d 161 (1975);

NEW HAMPSHIRE:
*McCusker v Valley News,* 121 NH 258; 428 A2d 493 (1981), cert den 454 US 1017 (1981);

NEW MEXICO:
*Marchiondo v Brown,* 98 NM 394; 649 P2d 462 (1982);

discussion that *Gertz* represents the proper standard in cases involving private plaintiffs, and, in two states, federal courts have interpreted state law as having adopted *Gertz*.[18] By contrast, only

OHIO:
*Thomas H Maloney & Sons, Inc v E W Scripps Co,* 43 Ohio App 2d 105; 334 NE2d 494 (1974), cert den 423 US 883 (1975);

OKLAHOMA:
*Martin v Griffin Television, Inc,* 549 P2d 85 (Okla, 1976);

SOUTH CAROLINA:
*Jones v Sun Publishing Co,* 278 SC 12; 292 SE2d 23 (1982), cert den 459 US 944 (1982);

TENNESSEE:
*Memphis Publishing Co v Nichols,* 569 SW2d 412 (Tenn, 1978);

TEXAS:
*Foster v Laredo Newspapers, Inc,* 541 SW2d 809 (Tex, 1976), cert den 429 US 1123 (1977);

UTAH:
*Seegmiller v KSL, Inc,* 626 P2d 968 (Utah, 1981);

VIRGINIA:
*Gazette, Inc v Harris,* 229 Va 1; 325 SE2d 713 (1985), cert den sub nom *Fleming v Moore,* 472 US 1032 (1985), sub nom *Port Packet Corp v Lewis,* 473 US 905 (1985);

WASHINGTON:
*Taskett v King Broadcasting Co,* 86 Wash 2d 439; 546 P2d 81 (1976);

WEST VIRGINIA:
*Havalunch, Inc v Mazza,* 294 SE2d 70 (W Va App, 1982);

WISCONSIN:
*Denny v Mertz,* 106 Wis 2d 636; 318 NW2d 141 (1982), cert den 459 US 883 (1982).

[18] MISSISSIPPI:
*Brewer v Memphis Publishing Co,* 626 F2d 1238 (CA 5, 1980), cert den 452 US 962 (1981);

PENNSYLVANIA:
*Mathis v Philadelphia Newspapers, Inc,* 455 F Supp 406 (ED Pa, 1978).

four states have expressly adopted the *Rosenbloom* public-interest standard,[19] and one of those cases was a federal court's interpretation of state law.[20] New York has adopted neither the *Gertz* nor the *Rosenbloom* standard, opting instead for a gross-negligence standard. See *Chapadeau v Utica Observer-Dispatch, Inc,* 38 NY2d 196; 379 NYS2d 61; 341 NE2d 569 (1975).

The rationale most often given for adoption of a negligence standard is that first enunciated in

---

[19] Alaska:
*Gay v Williams,* 486 F Supp 12 (Alas, 1979) (construing Alaska law);

California:
*Rollenhagen v City of Orange,* 116 Cal App 3d 414; 172 Cal Rptr 49 (1981);

Colorado:
*Diversified Management, Inc v Denver Post, Inc,* 653 P2d 1103 (Colo, 1982);

*Walker v Colorado Springs Sun, Inc,* 188 Colo 86; 538 P2d 450 (1975);

Indiana:
*AAFCO Heating & Air Conditioning Co v Northwest Publications, Inc,* 162 Ind App 671; 321 NE2d 580 (1974), cert den 424 US 913 (1976).

See Anno: *State constitutional protection of allegedly defamatory statements regarding private individuals,* 33 ALR4th 212, for a detailed discussion of the states' application of the various fault standards.

[20] Section 580B of 3 Restatement of Torts, 2d, is in keeping with the majority rule. It provides:
  580B. Defamation of Private Person
  One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
  (a) knows that the statement is false and that it defames the other,
  (b) acts in reckless disregard of these matters, or
  (c) *acts negligently in failing to ascertain them.* [Emphasis added.]

*Gertz, supra:* "[P]rivate individuals are more deserving of protection because, as a class, they are less likely to seek public attention and comment." *Foster v Laredo Newspapers, Inc,* 541 SW2d 809, 819 (Tex, 1976). The Supreme Court of Tennessee reasoned that only the *Gertz* negligence standard " 'recognizes that the special needs of the private plaintiff require a more stringent standard of liability than is imposed when the plaintiff is a public figure or official who has ready media access and has voluntarily assumed the risk of defamatory comment by placing himself in the public eye.' " *Memphis Publishing Co v Nichols,* 569 SW2d 412, 418 (Tenn, 1978), quoting Note, *State court reactions to* Gertz v Robert Welch, Inc, 29 Vand L R 1431, 1444 (1976).

State courts that have adopted a negligence standard also rely heavily on their own state constitutions as support for their decisions.[21] The state constitutions have been used most often as support for placing greater emphasis on privacy rights. See, e.g., *Troman v Wood,* 62 Ill 2d 184; 340 NE2d 292 (1975); *Gobin v Globe Publishing Co,* 216 Kan 223; 531 P2d 76 (1975); *McCall v Courier-Journal & Louisville Times Co,* 623 SW2d 882 (Ky, 1981), cert den 456 US 975 (1982); *Martin v Griffin Television, Inc,* 549 P2d 85 (Okla, 1976); *Gazette, Inc v Harris,* 229 Va 1, 15; 325 SE2d 713 (1985); *Denny v Mertz,* 106 Wis 2d 636; 318 NW2d 141 (1982).

In *Troman, supra,* p 195, the Illinois Supreme Court observed:

---

[21] The Michigan Constitution provides:

Every person may freely speak, write, express and publish his views on all subjects, *being responsible for the abuse of such right;* and no law shall be enacted to restrain or abridge the liberty of speech or of the press. [Const 1963, art 1, § 5. Emphasis added.]

The freedom of speech provisions . . . recognize
the interest of the individual in the protection of
his reputation, for they provide that the exercise
of the right to speak freely shall not relieve the
speaker from responsibility for his abuse of that
right. [See also *Gobin, supra,* pp 231-233.]

The Kentucky Constitution was also found to man-
date "a standard which adequately protects the
private individual from defamation." *McCall, su-
pra,* p 886. In *Martin, supra,* p 92, the Oklahoma
Supreme Court explicitly distinguished the lan-
guage of the Oklahoma Constitution from that of
the federal constitution. Like the previously men-
tioned state constitutions and our own, the free
speech provision of the Oklahoma Constitution
requires " '[e]very person . . . [to be] responsible
for the abuse of that right . . . .' " Okla Const, art
II, § 22. The *Martin* court thus found the negli-
gence standard to be "more parallel with" the
Oklahoma Constitution. The Wisconsin Supreme
Court also concluded that its state constitution
does not provide for broader free press rights than
does the federal constitution. *Denny, supra,* p 655,
n 27.[22]

Other state courts relied on state statutes or the
common law as justification for adopting the negli-
gence standard for private-person-plaintiff cases.
See *Phillips v Evening Star Newspaper Co, supra;
Troman, supra,* pp 194-196; *Denny, supra,* p 656.
At least one state court perceived practical advan-
tages in adopting the negligence standard.

The application of the negligence standard in
tort cases is so well established that juries can
safely be expected to comprehend the term when
applied in defamation cases. Nor is the negligence

---

[22] We have not been asked to find a standard under the Michigan
Constitution higher than that provided in *Gertz.*

standard unknown to common law defamation.
[*Jacron Sales Co, Inc v Sindorf*, 276 Md 580, 596;
350 A2d 688 (1976).]

A final, and perhaps most significant, reason for
state court rejection of anything but a negligence
standard emanates from the courts' understanding
and interpretation of public policy. See *Miami
Herald Publishing Co v Ane*, 423 So 2d 376, 387
(Fla App, 1982); *Cahill v Hawaiian Paradise Park
Corp*, 56 Hawaii 522, 533-534; 543 P2d 1356 (1975);
*Troman, supra*, pp 194-196 (Illinois); *Gobin, supra*,
pp 231-233 (Kansas); *Stone v Essex Co Newspa-
pers, Inc*, 367 Mass 849, 856-857; 330 NE2d 161
(1975); *Seegmiller v KSL, Inc*, 626 P2d 968, 973
(Utah, 1981); *Taskett v King Broadcasting Co*, 86
Wash 2d 439, 448-450; 546 P2d 81 (1976); *Denny,
supra*, p 656 (Wisconsin). The nonconstitutional
policies cited by state courts are numerous, but,
generally, the courts tend to focus on the serious-
ness of the injury to the allegedly defamed party.

The Florida Supreme Court, for example,
stressed the important role that the defamation
action plays in a free society.

> [It] represents the individual's sole remedy
> against the occasional excesses of the print and
> electronic media which often have vast resources
> to inflict untoward damage upon an individual.
> Surely, a decent, open society cannot, in the name
> of press and speech freedom, so thoroughly under-
> mine this remedy as to render it useless to those
> people who have been damaged by a defamatory
> falsehood negligently uttered in the mass media
> and have not in any way sought the public lime-
> light. [*Miami Herald, supra*, p 387.]

The Massachusetts Supreme Court likewise em-
phasized the *state's* interest in the individual's
reputational protection, "for this 'reflects no more

than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.' " *Stone, supra,* p 858, quoting *Rosenblatt v Baer,* 383 US 75, 92; 86 S Ct 669; 15 L Ed 2d 597 (1966) (Stewart, J., concurring). The Utah court equated freedom from defamation with freedom from physical violence.

> [W]e recognize that the integrity of an individual's reputation is essential to his standing in society, in his vocation, and even in his family. It may indeed be indispensable to one's sense of self-worth. The dignity of virtually every human being depends in part upon his right to be known as the person he truly is. For centuries it has been recognized that an assault upon a person's character may be far more damaging and long-lasting than an assault upon his person. Indeed, freedom from false attacks on one's personality may be viewed as at least as essential to ordered liberty as freedom from physical abuse. [*Seegmiller, supra,* p 973.]

The courts employed these policies and reasons for distinguishing between public and private individuals. Offering the protection of privilege to all matters of public interest is often said to be too broad an extension of a "free press" privilege. The Illinois court noted the infrequency of recoveries for actual malice and the fact that

> [w]hether a matter is one of public interest, . . . depends to some degree on whether the media themselves have chosen to make it one. [*Troman, supra,* p 196.]

The Hawaii court envisioned the negligence standard as one way "to make defaming publishers less willing to speak due to the risk of being found negligent." *Cahill, supra,* p 533.

Those states adopting a *Rosenbloom* public interest-related standard relied most heavily on the constitutional arguments advanced by the *Rosenbloom* plurality, striking the balance in favor of free speech. See, e.g., *Walker v Colorado Springs Sun, Inc,* 188 Colo 86; 538 P2d 450 (1975), cert den sub nom *Woestendiek v Walker,* 423 US 1025 (1975); *Diversified Management, Inc v Denver Post, Inc,* 653 P2d 1103 (Colo, 1982); *AAFCO Heating & Air Conditioning Co v Northwest Publications, Inc, supra.* While we appreciate the concerns articulated by the courts adopting the *Rosenbloom* standard, we find the balance struck by the United States Supreme Court in its development of the constitutional privilege to be sufficiently protective of free speech and provides the publisher with more than adequate "sanctuary" from the "cruel dilemma" we referred to in *Lawrence, supra,* p 137.

### 2. UNITED STATES CONSTITUTIONAL POLICY

There are several tension lines along which, to some extent, the original tort-law qualified privileges were developed and along which the United States Supreme Court struggled in developing the latter-day First Amendment privileges. They are basically: the need to balance a free flow of information and ideas necessary to our concept of freedom and democracy with the traditional right of the individual to redress harm to reputation, and the effect of privilege on public versus private figures.

These fundamental principles and the conflicts between them have been eloquently expressed in *New York Times* and its progeny.

Thus we consider this case against the back-

ground of a profound commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . . [*New York Times, supra,* p 270.]

\* \* \*

"The protection of the public requires not merely discussion, but information." [*Id.,* p 272.]

\* \* \*

The right of free public discussion of the stewardship of public officials was thus, in Madison's view, a fundamental principle of the American form of government. [*Id.,* pp 274-275.]

The First Amendment requires that we protect some falsehood in order to protect speech that matters. [*Philadelphia Newspapers, supra,* 89 L Ed 2d 794 (quoting *Gertz*).]

These concerns are similar to those that we articulated in *Lawrence:*

There is no need, at this date in our history, to urge that it is necessary to free institutions that the press itself be free. Today it is. The real issue before us is how free. Governmental interference is not the only threat to its freedom. On the contrary, a narrow or restrictive interpretation of the law of privilege in libel actions is equally dangerous. [*Id.,* p 137.]

We find that the constitutional privilege that has evolved in the time period since *Lawrence* is neither narrow nor restrictive. Rather, it has equitably balanced the public's need to know with the individual's right to privacy.

As the Court noted in *Gertz:*

[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's inter-

est in "uninhibited, robust, and wide-open" debate on public issues. [*New York Times,* p 270.] They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." [*Gertz, supra,* p 340.]

Especially in cases involving the interests of private individuals, the balancing process must not abandon the legitimate need to redress reputational injuries. As Justice Marshall expressed it,

> The protection of the reputation of such anonymous persons "from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." . . . But the concept of a citizenry informed by a free and unfettered press is also basic to our system of ordered liberty. Here these two essential and fundamental values conflict. [*Rosenbloom, supra,* p 78 (dissent).]

In concurrence in *Rosenbloom,* Justice White emphasized that the policies supporting the *New York Times* standard were much less applicable in cases involving private persons.[23] Similarly, the *Gertz* majority concluded

---

[23] One of those policies was the perceived threat of self-censorship by the media. However, Justice White has observed that that threat is much less a potential cause for concern when the reputation of private citizens is at stake.

> Some members of the Court seem haunted by fears of self-censorship by the press and of damage judgments that will threaten its financial health. But technology has immeasurably increased the power of the press to do both good and evil. Vast communication combines have been built into profitable ventures. My interest is not in protecting the treasuries of communicators but in implementing the First Amendment by insuring that effective communication which is essential to the continued functioning of our free society. I am not aware that self-

that the state interest in compensating injury to
the reputation of private individuals requires that
a different rule should obtain with respect to
them. [*Id.*, p 343.]

The conflicting values debated in these water-
shed United States Supreme Court cases finally
came to rest in a five-justice majority opinion in
*Gertz*, in which it was said:

> The legitimate state interest underlying the law
> of libel is the compensation of individuals for the
> harm inflicted on them by defamatory falsehood.
> We would not lightly require the State to abandon
> this purpose . . . . In our continuing effort to de-
> fine the proper accommodation between these com-
> peting concerns, we have been especially anxious
> to assure to the freedoms of speech and press that
> "breathing space" essential to their fruitful
> exercise. . . . To that end, this Court has ex-
> tended a measure of strategic protection to defam-
> atory falsehood. [*Gertz*, pp 341-342.]

We believe that the United States Supreme Court
has ably defined and provided for the protection
necessary to ensure free and open debate of public
issues. It should be remembered that, since *Gertz*,
that Court has granted defamation defendants
even greater protection by shifting the burden of
proof of falsity when speech involving issues of
public interest is at stake. *Philadelphia Newspa-
pers, supra*.

censorship has caused the press to tread too gingerly in report-
ing "news" concerning private citizens and private affairs or
that the reputation of private citizens has received inordinate
protection from falsehood. I am not convinced that we must
fashion a constitutional rule protecting a whole range of dam-
aging falsehoods and so shift the burden from those who
publish to those who are injured. [*Rosenbloom, supra*, p 60
(White J., concurring).]

### 3. THE MICHIGAN RULE

In defining the constitutional limits to the law of libel, it is understandable that the balancing scales tip in favor of constitutional interests rather than the individual reputational interests entrusted to tort law. Now that the constitutional limits have been clearly established, however, our task is to enunciate a tort-law policy that should be based on something less than the sacred ground of First Amendment rights. It is from that perspective that we find it unnecessary and unwise to extend a public-interest qualified privilege beyond what is constitutionally required.

Historically, libel law favored plaintiffs. Malice was presumed, see, e.g., *Bacon, supra,* p 172, truth was often the only defense, and punitive damages were commonly employed. See *Peisner II, supra,* 421 Mich 132. See, generally, Justice White's historical summary of libel law in *Gertz, supra,* pp 371-376. Privileges evolved in response to the perceived harshness of the law of libel. As Prosser & Keeton note:

> The courts developed a complex structure of privileges to protect and advance the societal and individual interests in the free flow of ideas and information. Much of the structure would have been unnecessary and much of the complexity resulting from the development of qualified privileges discussed hereafter could have been obviated if negligence, or something worse, with respect to truth or falsity of the matter published had been a prerequisite to recovery in any case. [Prosser & Keeton, *supra,* § 114, p 815.]

Since that time, then, constitutional law developments have changed most of the conditions that compelled the early tort-law privileges.

Under the *New York Times* standard, as it has

developed, a publication about a public official or
public figure is privileged in the absence of malice.
Under *Gertz,* a communication is not constitution-
ally privileged if its subject involves a private
person in the context of a matter of public inter-
est; however, states are not permitted to impose
liability without fault; nor can there be presumed
or punitive damages without a showing of malice.
In addition, when the speech is of public concern,
a private-person plaintiff in a defamation suit has
the burden of proving falsity. *Philadelphia News-
papers.* Thus, the Michigan common-law public-
interest privilege has been constitutionally sub-
sumed almost in its entirety.[24]

The "policy" behind the public-interest privilege
has now been largely engrafted onto the penumbra
of our First Amendment rights. The United States
Supreme Court has chosen to formulate a constitu-
tional privilege that is intended to advance "robust
and wide-open debate" by measuring the "public"
status of the injured parties, rather than the con-
tent of the publication. Speech content is consid-
ered only as it regards the burden of proof of
falsity.[25] Ours is not a constitutional mission, and
it is not given to us to redesign that standard. We
do not think we ought to fashion our state's tort
law in a manner that would only fine tune the
United States constitutional standard in one re-
spect.

In summarizing our tort-law analysis of this

---

[24] As noted *supra,* in n 13, this conclusion has no effect on other
recognized common-law privileges in Michigan.

[25] If we were writing on a clean slate and ours were a constitutional
mission, we might well be persuaded by the logic of the *Rosenbloom*
standard. We note, for instance, that under the *Gertz* standard a
public person receives no protection from a defamation relative to the
person's private life, but a private person may be able to take
advantage of the protective law of libel when there may be a public
issue at stake. See Smolla, *Let the author beware: The rejuvenation of
the American law of libel,* 132 U Pa L R 1 (1983).

issue, we first announce our value judgment that reputational interests are as important today, if not more so, as when the common law first recognized defamation as a tort. In an organized and centralized society, where at least economic relationships are likely to be based on an impersonal or reputational level as opposed to the more decentralized and personal approach characteristic of a bygone era, how we are perceived takes on greater significance. For better or worse, in today's world, most of us are known by our images.[26]

Secondly, it is obvious that the policy imperatives that led to the adoption of many of the qualified privileges, including the public-interest privilege, resulted from the then-existing harshness of the law of libel and the absence of any constitutionally based privilege. As described above, that harshness has been removed.

Finally, while reliance on rhetorical pronouncements and speculation about "self-censorship" and "breathing room" are necessary to protect First Amendment freedoms, we look more to empirical evidence in search of a justification for sacrificing the tort-law protection for one defamed. We would not be adverse to upholding a public-interest privilege that would apply irrespective of the status of the defamed party if a strong societal interest, similar to the interest that compelled this privilege a century ago, were indicated. We are not convinced such is the case. It has not, for instance, been brought to our attention that in the over thirty states now applying a *Gertz* standard there has been any diminution in the volume or quality of the reporting of arrests or, for that matter, any other subject.[27]

---

[26] See Boorstin, *The Image: A Guide to Pseudo-Events in America* (Magnolia, Mass: Peter Smith, Inc, 1984), for analysis of this modern phenomenon.

[27] One author has lamented the fact that as the courts have placed

The policy question then, as we see it, is whether, in a time when the media has developed the technology, expertise, and resources to bring to our eyes and ears, on an hourly basis, detailed information on almost any subject from anywhere in the world, it is too much to ask or too detrimental to the liberalizing influence of such a free flow of information that the task be exercised with reasonable care. We think not.

Other institutions have in recent years been subjected to increased pressures either from evolving principles of tort law or from increased use of that law, and, while in some cases it has been suggested that the availability of the product involved would be lessened, that has not always been shown to be the case. Although adherence to a standard of care in the publishing business could certainly involve costs, in our view such costs would not necessarily result in the restriction of a free flow of nonlibelous information. The raison d'être of the media is to report news—as much and as quickly as possible. It is not likely that the exercise of such responsibility would shrink in the face of a reasonable-person standard of care.

The compelling reasons for the qualified public-interest privilege are now being served by heightened constitutional standards. The need to further sacrifice tort recovery for false defamation of a private person resulting from negligence has not been shown. Thus, we adopt the *Gertz* standard in place of the former public-interest privilege, and hold that this plaintiff was not required to show

more barriers to tort recovery for publications there nonetheless has been an increase in the number of libel actions brought against media defendants and a corresponding increase in the number and value of verdicts. See Smolla, *supra.* We would only observe that while such a phenomenon could indicate a lack of adequate protection in the law, we also know that litigants and juries often send warning signals regarding a need to redress grievances or injuries not otherwise tended to in society.

malice on the part of the defendant. We, therefore, affirm the Court of Appeals reversal of the trial court's grant of summary judgment.

Although we find that the former common-law public-interest privilege has been subsumed in the constitutional privilege, on remand, it will nevertheless be necessary to determine the "public interest" status of the communication in question in order to apply the *Philadelphia Newspapers* gloss on the constitutional rule. In the interest of judicial economy, and because the issue has been briefed, *albeit* in a slightly different context, we address this public interest question in order to facilitate the trial judge's and the parties' understanding of the proper burden of proof of falsity.

### IV. BURDEN OF PROOF OF FALSITY

In applying the latest aspect of the constitutional law of libel, it is necessary to make the determination that defendants would have us make under the guise of state tort-law privilege: Namely, does the communication in question amount to "speech . . . of public concern"? *Philadelphia Newspapers, supra,* 89 L Ed 2d 787. If so, then the plaintiff, even though a private person, must bear the burden of proving the falsity of the communication, as he would have been required to do under the common-law qualified public-interest privilege. See *Bonkowski v Arlan's Dep't Store,* 383 Mich 90; 174 NW2d 765 (1970) (when qualified privilege applies, plaintiff must prove untruth). He need not go so far as to prove malice, however, as he would be required to do if we were to recognize that privilege and find it applicable. Justice O'Connor described the applicable constitutional standard in *Philadelphia Newspapers:*

When the speech is of public concern but the

plaintiff is a private figure . . . the Constitution
still supplants the standards of the common law,
but the constitutional requirements are, in at least
some of their range, less forbidding than when the
plaintiff is a public figure and the speech is of
public concern. [*Id.*, 89 L Ed 2d 792.]

We find that the newspaper report of plaintiff's
arrest that is at issue in this case is speech of
public concern, and that, therefore, under the
constitutional rule, defendant is not required to
prove the truth of the article as its defense.
Rather, plaintiff must prove as part of his case, in
addition to defendant's fault, that the statements
at issue are false.

Although "public interest" is an elusive term,
and may be said to include any matter reported on
by the media,[28] we do not undertake here to estab-
lish the parameters of a term, the origins of which
emanate from constitutional law and which will
undoubtedly be further defined by the United
States Supreme Court. Rather, we merely hold
that the subject matter of the communication at
issue here surely falls well within those parame-
ters. In so holding, we decline to distinguish, as did
the Court of Appeals, the essence of the article
from its supporting facts or details.[29]

The subject deemed to be a matter of public
concern in *Philadelphia Newspapers* was organized
crime. The articles in question in that case had
alleged that plaintiffs had links to organized crime

[28] The late Theodore H. White, reporter and historian, in his book,
*In Search of History: A Personal Adventure* (New York: Harper &
Row, Inc, 1978), p 206, spoke of "the power of the press to set the
agenda of public discussion."

[29] As defendant points out, the "details" given in the instant article
were those which formed the probable cause necessary for making the
arrest. Since the constitutional rule regarding burden of falsity ema-
nates from First Amendment policies favoring a free and open soci-
ety, the basis of an arrest would clearly fall within the definition of
public interest.

and that they used those links to influence state government. Other "public interest" cases, although in the context of privilege, also involved organized crime or law enforcement activities. See *Rosenbloom* (article regarding plaintiff's arrest "on charges of possession of obscene literature"); *Gertz* (article dealing with prosecution of a Chicago policeman for second-degree murder portrayed the plaintiff lawyer as the architect of a "frame-up");[30] *Gay v Williams,* 486 F Supp 12, 13 (Alas, 1979) (AP release about plaintiff, an "Alaska bush pilot accused in Arizona drug trafficking"); *Orr v Argus-Press Co,* 586 F2d 1108, 1110 (CA 6, 1978) (article reporting that plaintiff had been "charged in [a] shopping mall fraud"); *Schultz v Reader's Digest,* and *Schultz v Newsweek* (organized crime and the disappearance of Jimmy Hoffa); *Walker v Colorado Springs* (articles about plaintiff's alleged purchase of stolen goods).

As the plurality in *Rosenbloom* observed:

> The community has a vital interest in the proper enforcement of its criminal laws, . . . : the public has an interest both in seeing that the criminal law is adequately enforced and in assuring that the law is not used unconstitutionally to suppress free expression[, *id.,* p 43,]

or, we would add, to harass innocent persons. The court in *Gay, supra,* p 16, n 14, noted that "[c]riminal activities have consistently been recognized as matters of public interest."

Our own cases of *Fortney, supra,* and *Timmis, supra,* emphasized the fact that the published statements "concern[ed] acts of members of a law

---

[30] Although *Gertz* rejects the public-interest *privilege* of *Rosenbloom,* it did not address the burden of proof of falsity issue. *Philadelphia Newspapers,* 89 L Ed 2d 792, characterized *Gertz* as a "private person/issue of public concern" case.

enforcement agency." *Id.,* p 370. The article in *Miner, supra,* reported on "the official conduct of those who fill offices of public trust and confidence, in the administration of which the whole community has an interest . . . ." *Id.,* p 360.

The rule of *Philadelphia Newspapers* does not impose an onerous burden on the private-person plaintiff, who must already show some degree of fault on the defendant's part. See *Gertz.* Thus, the possible effects of a broad interpretation of "public interest" are not nearly as serious as they would be in the context of a public-interest *privilege.* In any case, at this point, we adopt a relatively narrow reading of that term for purposes of applying the constitutional rule.

We hold that a report of an arrest and of the facts used to establish the probable cause for the arrest amount to speech of public concern and that the rule of *Philadelphia Newspapers* applies. Because of the importance of this type of information in a free society, plaintiffs who choose to bring actions in libel on the basis of such reports must first prove that the statements were false in addition to proving that defendants were negligent in so reporting.

We affirm the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

Williams, C.J., and Levin and Archer, JJ., concurred with Brickley, J.

Cavanagh, J. (*concurring in part and dissenting in part*). I concur in the analysis and conclusions drawn in parts II and III of the majority opinion. I question, however, the fourth section.

In section IV, the majority analyzes the proper burden of proof of falsity in a defamation case

involving a media defendant and a private-figure plaintiff. To do so, the opinion discusses *Philadelphia Newspapers, Inc v Hepps*, 475 US —; 106 S Ct 1558; 89 L Ed 2d 783 (1986). In that case, the United States Supreme Court held that in defamation cases involving private-figure plaintiffs and speech of public concern the plaintiff has the burden of proving falsity. In introducing this analysis, the majority notes that in the present case the issue raised in *Philadelphia* "has been briefed, *albeit* in a slightly different context . . . ." (*Ante*, p 203.) The majority concludes that the report of an arrest and of the facts used to establish probable cause for the arrest amount to speech of public concern, and thus at trial, plaintiff has the burden of proving falsity. I dissent from the inclusion of section IV for several reasons.

First, the parties did not raise the present issue. *Philadelphia* was decided on April 21, 1986. The parties' briefs were submitted to this Court in late 1985, and thus do not cite or discuss *Philadelphia.* Neither do the parties raise the issue resolved in *Philadelphia* regarding the burden of proof of falsity.

Second, even if the parties had raised the question of burden of falsity, it is not clear that the issue would properly be before the Court. Unlike the majority, I think it is fairly clear that the article contained false information. The Court of Appeals also reached this conclusion.

> The parties agree that the underlying facts behind the story are substantially false: plaintiff did not commit the rape. Although plaintiff was arrested for the crime, he was never charged. [137 Mich App 42-43; 357 NW2d 794 (1984).]

The fact that defendant printed what arguably

amounts to a retraction on December 3, 1980, supports a finding that falsity is not at issue. If there is no dispute as to the article's falsity, then the question who has the burden of proving falsity becomes irrelevant. It is precisely this question which *Philadelphia* addresses. The case creates a rule of law only for those cases in which there is a factual dispute regarding the truth of the publication.[1]

Third, even if *Philadelphia* were applicable, I think this Court accepts an extra and inappropriate burden by discussing it. The trial lawyers and judge should bear the responsibility of raising the issue and determining whether the case applies. This Court's discussion of it is pure dicta; it was not necessary to the resolution of the case. The majority concludes that reversal of the summary judgment is mandated before it even addresses the *Philadelphia* issue. I would stop at that point.

Finally, I think the majority's application of the *Philadelphia* rule to the present case is erroneous. While the report of an arrest might amount to speech of public concern, I do not agree that the surrounding details do. Such details are exactly what plaintiff finds false and defamatory. I would conclude that most of the article did not contain speech of public concern for the reasons expressed by the Court of Appeals in its rejection of defendant's public-interest privilege argument. 137 Mich App 58.

BOYLE, J. (*concurring in part and dissenting in*

---

[1] I find the majority's opinion at least unclear on this point. The first sentence of the introduction states that the facts in the case are undisputed. Later, the majority says, "It has not been found that the newspaper report of the plaintiff's arrest and the reasons for the arrest were false." (*Ante*, p 174.) The latter statement contradicts, without explanation, the Court of Appeals finding, and seems inconsistent with the introductory statement.

*part).* While I agree with Justice BRICKLEY that in a defamation suit involving a media defendant and a private plaintiff, absent the application of any common-law privilege, a negligence standard is appropriate, I do not agree, without further factual findings, that the official- and public-proceedings privilege provided by MCL 600.2911(3); MSA 27A.2911(3) is inapplicable in this case. Further, I wish to clarify that all of the common-law privileges traditionally available to all defendants, both media and otherwise, have not been "subsumed" by the constitutional mandates of *New York Times v Sullivan,* 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964), and *Gertz v Robert Welch, Inc,* 418 US 323; 94 S Ct 2997; 41 L Ed 2d 789 (1974), and are still a vital part of the jurisprudence of this state.

Justice BRICKLEY, in his analysis of this case, presumes that the "public-interest privilege" utilized by the Court of Appeals in such cases as *Weeren v Evening News Ass'n,* 2 Mich App 74; 138 NW2d 526 (1965), and *Dienes v Associated Newspapers, Inc,* 137 Mich App 272; 358 NW2d 562 (1984), has been subsumed by the constitutional requirement of *New York Times, supra,* which requires a finding of constitutional[1] malice before a public official or public figure may succeed in a defamation suit against a media defendant. The privilege utilized by the Court of Appeals to conditionally immunize news reports which are in the "public interest" appears to be a hybrid of two common-law[2] qualified privileges: communication to one who may act in the public interest, which

---

[1] Constitutional malice has been defined as knowledge that the defamatory statements are false or are made with reckless disregard of whether they are false or not. *New York Times, supra,* 280.

[2] It must be noted that neither party nor amici curiae in this case argue that the broad public-interest privilege applied in such cases as *Weeren, supra,* and *Dienes, supra,* is not actually a privilege recognized at common law.

requires a narrow audience and which applies normally only to nonmedia defendants, see *Nuyen v Slater,* 372 Mich 654; 127 NW2d 369 (1964); and the privilege of fair comment on matters of public concern, which usually involves editorials or opinions on public officials and matters of public concern, see *Lawrence v Fox,* 357 Mich 134; 97 NW2d 719 (1959).

The broader "public-interest privilege" applied by the Court of Appeals has, as Justice BRICKLEY suggests, been utilized exclusively to deal with media reports on matters of public interest. The rationale behind this "privilege" is identical to that espoused by the United States Supreme Court in *New York Times, supra,* and its progeny,[3] and I can only conclude that this "hybrid privilege" was utilized by the Court of Appeals to address the same constitutional concerns. As *New York Times* and *Gertz* have now set the standards required in this area, I agree that the use of a broad "public-interest privilege" to conditionally immunize reports of matters in the public interest, which it appears may have been unique to this state, is no longer necessary or appropriate.

However, it must be noted that the two traditional common-law privileges, from which this broad privilege appears to have grown, are still available to defendants in a defamation action in

---

[3] Interestingly, in *Gertz v Robert Welch, Inc, supra,* 346, the United States Supreme Court noted that the public-interest rationale behind *New York Times* would be difficult to extend to private plaintiffs.

> [I]t would occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of "general or public interest" and which do not—to determine, in the words of Mr. Justice Marshall, "what information is relevant to self-government." . . . We doubt the wisdom of committing this task to the conscience of judges.

this state. This is important to note because
nonmedia defendants may not be afforded the
same constitutional protection as media defen-
dants[4] and because the protection afforded by the
privileges may be greater than that required by
the constitutional standard of *Gertz.*[5]

[4] Although traditionally the *New York Times* standard has been
viewed as protecting media defendants, the rationale of that decision
applies equally to nonmedia defendants. See Smolla, *Let the author
beware: The rejuvenation of the American law of libel,* 132 U Pa L R
1 (1983). However, it is probably true that the standards set forth in
*Gertz, supra,* 347-348, are not applicable to nonmedia defendants.

This approach provides a more equitable boundary between
the competing concerns involved here. It recognizes the
strength of the legitimate state interest in compensating pri-
vate individuals for wrongful injury to reputation, yet shields
the press and broadcast media from the rigors of strict liability
for defamation.

However, former Chief Justice Burger in his opinion in *Hutchinson
v Proxmire,* 443 US 111, 133, n 16; 99 S Ct 2675; 61 L Ed 2d 411
(1979), noted that this issue had not been decided by the United
States Supreme Court.

Prosser & Keeton, Torts (5th ed), § 113, p 808, suggest this confu-
sion could be cleared up by requiring some degree of fault in all cases.
"Much could be accomplished by way of simplifying the law and
adequately protecting speech in the private area by way of requiring
fault with respect to truth or falsity of the matter published in all
situations. Most qualified privileges could then be abolished."

[5] I do not address the question whether, after *New York Times,* and
*Gertz,* qualified privileges require a showing of common-law malice
(ill will or bad motive) or constitutional malice (knowing that state-
ments are false or reckless disregard for whether or not they are
false). The Restatement takes the view that a showing of constitu-
tional malice is now appropriate in the case of all qualified privileges:

A substantial minority of the cases at common law took this
position. With the current familiarity with the constitutional
standard of reckless disregard, arising from the case of *New
York Times v Sullivan* (1964) 376 US 254, and the more
frequent use of it in the abuse-of-privilege cases as a result, this
standard seems to offer a felicitous solution. It is anticipated
that as other courts realize the situation they will agree with
it. [3 Restatement Torts, 2d, § 592A, p 260.]

See also Smolla, n 4 *supra,* pp 79-80 ("The law of defamation will
evolve much more coherently if ill-will malice is discarded altogether,
and the knowing or reckless disregard of the truth standard is used

A proper determination of this case, therefore, requires first that we decide whether such a privilege applies to the statements published by the defendant regarding Mr. Rouch's arrest. In the event that no such privilege exists, or if the privilege has been abused, or if it does not afford the constitutionally required standard of fault,[6] then it is appropriate to consider the proper standard of liability which should be applied under the dictates of *New York Times* and *Gertz.*

The rationale behind the common-law privileges in defamation cases, according to Prosser, is analogous to that behind the privileges available to defendants in assault and battery cases.

> It rests upon the same idea, that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation. [Prosser & Keeton, Torts (5th ed), § 114, p 815.]

The privileges are divided into two types: those which are absolute, immunizing defendants from liability without regard to their purpose or motive or the reasonableness of their conduct, and those which are qualified, requiring a showing of malice before there can be any recovery.

Absolute immunity is granted in those situations in which "there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives." Prosser & Keeton, *supra,* § 114, p 816. Prosser & Keeton list six absolute privileges which are available to both media and nonmedia defendants.

---

for all conditional privileges, whether their pedigree is common law, constitutional, or both.").

[6] See n 5.

The most commonly encountered of the absolute privileges is the privilege surrounding judicial proceedings.[7] This privilege immunizes statements made by judges in their judicial capacity and has been extended to cover, among others, grand and petit jurors, witnesses, counsel in the conduct of a case, parties in private litigation, defendants and instigators of prosecution. See 3 Restatement Torts, 2d, §§ 585-589, pp 244-252. Absolute privileges also cover: members of legislative bodies for acts in the performance of their duties, which has been extended to cover legislative witnesses, see Restatement, *supra,* § 590A; communications between certain governmental executive officers; instances where the plaintiff has consented to the publication; communications between husbands and wives; and political broadcasts required under § 315(a) of the Federal Communications Act of 1934 (47 USC 315[a]). *Farmers Educational & Cooperative Union of America, North Dakota Div v WDAY, Inc,* 360 US 525; 79 S Ct 1302; 3 L Ed 2d 1407 (1959). The Restatement is of the view that any publication required by law is also absolutely privileged. Restatement, *supra,* § 592A, p 257.

The qualified privileges traditionally available to defendants, both media and otherwise, are intended to shield publishers from liability in a defamation suit, absent a showing of malice.[8] Perhaps the one most commonly used is the privilege to communicate to one who may act in the public interest. This privilege, commonly called the "pub-

[7] It appears that the majority may have confused this privilege with the separate and distinct privilege to report on official and public proceedings. Although some courts have extended the judicial-proceedings privilege to cover official publication of judicial opinions, it has not been viewed normally as exempting reports of judicial proceedings, but rather as foreclosing liability for statements made in the proceedings themselves. Reports of such statements were traditionally covered by the latter privilege.

[8] See n 4.

lic interest" privilege, allowed publication to a restricted audience of matters in the public interest. As Prosser & Keeton note, this

> involves communications made to those who may be expected to take official action of some kind for the protection of some interest of the public. . . . The privilege includes false statements of fact concerning the plaintiff made in good faith; but, although it is not impossible that communications to other non-official interested persons will be protected, publication to the world at large in a newspaper is not. [Prosser & Keeton, *supra*, § 115, pp 830-831.]

This "public interest" privilege has been found to cover communications by private citizens to proper authorities for the prevention or detection of crime, complaints about public officials' conduct, and complaints to school boards questioning teachers' competence. See Prosser & Keeton, *supra*, § 115, pp 830-831; *Nuyen v Slater, supra.*

Other qualified privileges, as noted by Prosser & Keeton, include: communications in the interest of the publisher and in the interest of others or in which the publisher and the recipient have a common interest; and the privilege to make fair comment on matters of public interest.[9] See *Law-*

---

[9] The Restatement takes the view that the privilege to make fair comment on matters of public interest may have been rendered obsolete by United States Supreme Court decisions and that opinions, in general, may no longer be considered defamation. Quoting *Gertz, supra,* 339, the Restatement surmises,

> "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. . . ." This categoric statement was not necessary to the decision in the case in which it is found, and the Supreme Court's indications that an expression of opinion cannot be the basis of a defamation action have involved public communications on matters of

*rence v Fox, supra.* The Restatement also includes
a privilege for statements made by inferior admin-
istrative officers not covered by the absolute privi-
lege and for communications, under certain cir-
cumstances, which serve to protect the well-being
of a member of the family.

Qualified or conditional privileges only protect
those who do not abuse them. Traditionally, a
qualified privilege is abused when the publication
is made with malice, when the publisher does not
act for the purpose of protecting the interest in-
tended to be protected by the privilege, where
there is excessive publication, where the publisher
does not reasonably believe the publishing is nec-
essary to accomplish the purpose of the privilege,
or when one publishes unprivileged defamatory
matter in addition to privileged publications. See
Prosser & Keeton, *supra,* § 115, pp 832-835, and
Restatement, *supra,* §§ 599, 600, 602, 605A, pp 286-
297.

None of the foregoing absolute or conditional
privileges is applicable in the case at bar. How-
ever, both Prosser & Keeton, *supra,* § 115, pp 836-
838, and the Restatement, *supra,* § 611, pp 297-302,
detail what is described in both treatises as a
special type of privilege to report on official or
public proceedings. At common law, this privilege
was conditional, yet some commentators argue
that it is now constitutionally required to be an
absolute privilege.[10]

─────────────

public concern. Although it is thus possible that private com-
munications on private matters will be treated differently, the
logic of the constitutional principle would appear to apply to all
expressions of opinion of the first, or pure, type. [Restatement,
*supra,* § 566, comment c, pp 172-173.]

[10] In a recent article in the University of Illinois Law Review, it is
suggested that the United States Supreme Court decisions in *Cox
Broadcasting Corp v Cohn,* 420 US 469; 95 S Ct 1029; 43 L Ed 2d 328

According to the Restatement this privilege applies to all activities of government.

### Report of Official Proceeding or Public Meeting

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported. [Restatement, *supra,* § 611, p 297.]

This privilege existed according to Prosser & Keeton, *supra,* § 115, p 836, "upon the idea that any member of the public, if he were present, might see and hear for himself, so that the reporter is merely a substitute for the public eye— this, together with the obvious public interest in having public affairs made known to all."

Traditionally, a publication was privileged if it was a fair and accurate report of the official proceedings, although courts have allowed some leeway, most often finding that minor inaccuracies would not defeat the privilege. Embellishments of

(1975), and *New York Times,* require that states modify their application of the official-proceedings privilege.

*New York Times* and *Cox* have transformed the privilege to report on public proceedings. At common law, courts granted the publisher of defamatory matter in a report of an official act or proceeding a privilege only if the report was fair, accurate, and made without express malice. Constitutional privilege, however, absolutely protects such reports so long as the reports accurately depict the proceedings observed. . . .

A few states have enacted statutes that grant absolute immunity to accurate reports of public proceedings and documents. These statutes, like the *Second Restatement,* properly observe the first and fourteenth amendments' demand that dissemination of accurate information regarding the activities of governmental institutions be free from sanction. [Workman, *Reports upon public proceedings and documents: Absolutely protected by constitutional privilege,* 1985 U Ill L R 1059, 1074-1075.]

the facts in the official proceedings, however, would be an abuse and the publisher would lose the protection of the privilege. See, e.g., *McAllister v Detroit Free Press Co,* 76 Mich 338; 43 NW 431 (1889).

Most courts which have considered the question have applied the privilege to reports of official criminal police proceedings. See, e.g., *Turnbull v Herald Co,* 459 SW2d 516, 520 (Mo App, 1970) (privilege extends to "actions and activities of police officers, including the details and reasons for an arrest"); *Phillips v Evening Star Newspaper Co,* 424 A2d 78 (DC App, 1980) (information in arrest records and report of the fact of arrest privileged); *François v Capitol City Press,* 166 So 2d 84, 89 (La App, 1964) (privilege to publish "fact that a person was arrested and the charges for which he is being held"); *Piracci v Hearst Corp,* 263 F Supp 511 (D Md, 1966); *Commercial Publishing Co v Smith,* 149 F 704, 706 (CA 6, 1907) ("[t]he publication of the fact that one has been arrested, and upon what accusation" privileged).

The Restatement and Prosser & Keeton also view reports of arrests as privileged under the official-proceedings privilege. The Restatement, often quoted by courts in this regard, notes:

> An arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section. On the other hand statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section. [Restatement, *supra,* § 611, comment h, p 301.]

The scope of the official-proceedings privilege has been extended beyond reports of the official proceedings, themselves. Courts have also uniformly applied it to reports of any matter contained in official records which are part of the official proceedings, such as public court files. Prosser & Keeton, *supra,* § 115, p 836; *Cox Broadcasting Corp v Cohn,* 420 US 469; 95 S Ct 1029; 43 L Ed 2d 328 (1975); *Lotrich v Life Printing & Publishing Co,*[11] 117 Ill App 2d 89; 253 NE2d 899 (1969); *McAllister, supra.*

The privilege does not extend, however, to "unofficial talk of such officials as policemen, as distinct from their official utterances or acts, such as an arrest." Prosser & Keeton, *supra,* § 115, pp 836-837. We noted this in *McAllister, supra,* 356:

> And the reporter of a newspaper has no more right to collect the stories on the street, or even to gather information from policemen or magistrates out of court, about a citizen, and to his detriment, and publish such stories and information as facts in a newspaper, than has a person not connected with a newspaper to whisper from ear to ear the gossip and scandal of the street.

Because the privilege covered fair and accurate reports of public records which are *part* of an official proceeding, there is also a requirement in most jurisdictions that some official action[12] has

---

[11] Justice Brickley finds that *Lotrich, supra,* and several cases from other states, see *ante,* p 171, are construing a broader privilege than that provided in Michigan. However, all of the cases involve the application of the same special common-law privilege reported in both Prosser & Keeton and the Restatement which has traditionally been available to all defendants in a defamation action in this and other states.

[12] In his opinion, Justice Brickley draws a distinction between an official-proceedings privilege and the Restatement privilege in § 611 which he believes is an "official action" privilege. At common law, some official action was required before a statement could be said to

been taken before the publisher can escape liability. Consequently, a "pleading or a deposition filed in a case but not yet acted upon may not be reported under the claim of privilege." Prosser & Keeton, *supra,* § 115, p 837.[13] Logically, this would also require that more than mere investigative work have been undertaken by a government agency in a criminal case.

There appears to be a split of authority on the question whether a publisher must have actually relied on the public records which are part of an official proceeding, or whether it is adequate that the information published is actually contained in such a record. See, e.g., *Medico v Times, Inc,* 643 F2d 134 (CA 3, 1981), and *Bufalino v Associated. Press,* 692 F2d 266 (CA 2, 1982).

The best reasoned approach[14] and the one which appears to have been followed most often in Michigan courts, is that actual reliance is not necessary, but that publishers act at their own peril if they rely on anything other than official documents. As Judge GILLIS of the Court of Appeals aptly stated

be privileged under the official-proceedings privilege. I do not read the Restatement as describing a different privilege, but, rather, as explaining the common-law prerequisite.

[13] Some states have repudiated the "official act" requirement. See, e.g., *Phillips v Evening Star, supra.*

[14] A commentator in a recent Villanova Law Review article finds an actual reliance requirement will have a "chilling" effect on the media's constitutional rights. In responding to the case of *Bufalino, supra,* which had required that the actual source of information be revealed, even if the information was in public records, the article notes:

The result will either be that the protection of the fair and accurate report privilege will be sacrificed, or the willingness of would-be informants to supply publishers with information will be lost. [O'Brien, *Torts—defamation—actual reliance on official records is needed for application of fair and accurate report privilege—identification of plaintiff as a public official is needed for application of* New York Times *actual malice standard,* 28 Vill L R 1028, 1048 (1982-1983).]

in *McCracken v Evening News Ass'n,* 3 Mich App
32, 38-39; 141 NW2d 694 (1966):

> The fact that the reporter herein relied on the
> word of another as to the nature of the complaint
> and warrant is immaterial. The statute does not
> command the reporter to obtain his information
> from the official court records. At his risk, and at
> the risk of his publisher, he may rely upon the
> word of another as to the contents of the com-
> plaint and warrant, and that it will be so issued if
> it has not already been. . . . Obviously, if a war-
> rant is never issued, there are no official proceed-
> ings that can be reported and this statute is not
> applicable.[15]

. The statute referred to by Judge Gillis is MCL
600.2911; MSA 27A.2911 which, I believe, contrary
to what Justice Brickley appears to find,[16] is the
codification of the common-law official-proceedings
privilege in this state.[17]

[15] A warrant is not an absolute requirement for the privilege to
apply. An arrest by police will also satisfy the official-action require-
ment.

[16] Justice Brickley states in his opinion:

> Broader privileges have included arrests and information
> given to a law enforcement official.

*        *        *

> We think a fair reading of the "public and official proceed-
> ings" language of the instant legislation would dictate that it is
> intended to cover at least the more limited common-law privi-
> lege to report judicial proceedings, but is not by its very
> language intended to be a "government action," "arrest rec-
> ord," or "public records" privilege. [*Ante,* p 171.]

All of the cases cited by Justice Brickley as inapposite to the statute
involve the application of the common-law "official proceedings"
privilege.

[17] Even if Justice Brickley were correct that § 2911 does not afford
the same protection as the common-law "official proceedings" privi-
lege, a determination would have to be made as to whether the
Legislature intended to preempt the previously available privilege. As
I believe the codification parallels the common law, I do not reach
this question.

Section 2911(3), in pertinent part, provides:

> No damages shall be awarded in any libel action brought against a reporter, editor, publisher, or proprietor of a newspaper for the publication in it of a fair and true report of any public and official proceeding, or for any heading of the report which is a fair and true headnote of the article published.

A parallel statute in New York has been held by the courts of that state to afford more protection than the common-law privilege, rather than less. In discussing the history of the New York official-proceedings law, the New York Court of Appeals noted in *Murray v Brancato,* 290 NY 52, 58; 48 NE2d 257 (1943):

> The Legislature of the State of New York by chapter 130 of the Laws of 1854 provided that "no reporter, editor or proprietor of any newspaper shall be liable to any action or prosecution, civil or criminal, for a fair and true report in such newspaper of any judicial, legislative, or other public official proceedings . . . except upon *actual proof of malice* in making such report, which shall in no case be implied from the fact of publication." This statute, it has been said, was "simply declaratory of the common-law." (*Ackerman v Jones,* 37 NY Super Ct 42, 54 [1874].) . . . Then in 1930 by chapter 619 of the Laws of 1930 the words "without proving actual malice in making the report" were omitted and no express qualification of the privilege remained in the statute. [Emphasis in original.]

It was further noted in *Farrell v New York Evening Post,* 167 Misc 412, 415; 3 NYS2d 1018 (1938), that "[b]y the amendment of 1930 [chapter 619] all publications falling within the purview of the statute are absolutely privileged." See also

*Keogh v New York Herald Tribune, Inc,* 51 Misc 2d 888; 274 NYS2d 302 (1966).[18]

I would find, from the language of § 2911, that the intent of the Legislature in codifying this privilege in 1931, as in New York, was not to change the protection offered at common law, but, rather, to extend it by making this an absolute privilege. This privilege would thus cover a report of an official and public proceeding and any public records which are part of that proceeding.

This construction parallels the suggestion that *Cox* requires absolute immunity for fair and accurate reports of official records and proceedings. See n 10. The Restatement was amended in 1977, after *Cox* was decided, to reflect this view:

> If the report of a public official proceeding is accurate or a fair abridgment, an action cannot constitutionally be maintained, either for defamation or for invasion of privacy. [Restatement, *supra,* § 611, comment b, p 298.]

It is undisputed that Mr. Rouch was arrested by the Emmett Township Police Department, and it appears to be true that he was later released on bond. Therefore, because libel requires a false statement, there is no cause of action for a report of the arrest, itself, of the charge for which he was arrested or, if true, of the fact that bail was set.

The privilege provided by the statute would only be necessary for *false* statements made in the story. As summary judgment was granted in this case and no factual findings were made on this issue, I am unable to determine on the record

[18] New York has since expanded the reach of its statute by extending the protection to "any person, firm or corporation" and by removing the term "public" from its provisions. See New York Civil Rights Law, § 74 (McKinney).

before us whether any of the alleged false statements were part of any public-official proceeding or were contained in any official report which was part of such proceeding.[19] If they were, I would find that the defendants are privileged under § 2911, provided that the reporting was a fair and true account of statements made in such proceedings or reports.

As to any statements which are not so privileged, I am in agreement with Justice BRICKLEY that, balancing the plaintiff's privacy interests with the requirements of the constitution,[20] a negligence standard is appropriate. Further, I agree that in this case the plaintiff is constitutionally required to prove falsity. *Philadelphia Newspapers v Hepps*, 475 US —; 106 S Ct 1558; 89 L Ed 2d 783 (1986).

I would remand this case to the trial court for further findings consistent with this opinion.

RILEY, J., concurred with BOYLE, J.

[19] As the Restatement, *supra*, § 611, comment h, p 301, notes, an official proceeding in the criminal law context would often begin with an arrest. Any actions or reports made by the police before that time are merely investigative in nature and thus not privileged as part of an official proceeding. As was previously stated, official action is a requirement of the common-law privilege. See Prosser & Keeton, *supra*, § 115, p 836.

[20] For an interesting discussion of this balancing, see Miller, *The William O. Douglas lecture: Press versus privacy*, 16 Gonzaga L R 843 (1981).